## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| By the United States Attorney's Office for | : | |
| the District of Columbia | : | |
| 555 4th Street, NW | : | |
| Washington, DC 20530 | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Civil Action No.: 19-1152 |
| | : | |
| JD EQUIPMENT de MEXICO, S de R.L. de CV | : | JURY TRIAL DEMANDED |
| c/o ALEXIS DUBOURDIEU URDANGARIN | : | |
| Owner/General Director | : | |
| 16209 State Highway 60 S | : | |
| Bay City, TX 77414 | : | |
| | : | |
| | : | |
| SOUTH POINT EQUIPMENT, LLC | : | |
| 16209 State Highway 60 S | : | |
| Bay City, TX 77414 | : | |
| | : | |
| ALEXIS DUBOURDIEU URDANGARIN | : | |
| Owner/General Director, JD EQUIPMENT | : | |
| de Mexico, S de R.L. de CV; Co-Owner/Director, | : | |
| SOUTH POINT Equipment, LLC | : | |
| 16209 State Highway 60 S | : | |
| Bay City, TX 77414 | : | |
| | : | |
| | : | |
| | : | |
| *Defendants*. | : | |

## **COMPLAINT**

Now comes the Plaintiff United States of America, by and through undersigned counsel, and respectfully states as follows:

1.      This is an action brought by Plaintiff United States of America against Defendants for treble damages, actual damages, and other equitable relief pursuant to the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq*. The False Claims Act provides that any person who knowingly submits a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of not less than $5,500 and more than $11,000 for each false claim, plus three times the amount of damages sustained by the government for each claim. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85. 3.

2.      As is more fully set forth below, during the relevant time, Defendants defrauded the United States of America in violation of the False Claims Act, 31 U.S.C. §§ 3729-32, as amended. Defendants individually and collectively knowingly submitted, caused to be submitted, and/or facilitated the submission of false and fraudulent documents and testimony to the federal government. Defendants knowingly submitted and/or aided in the submission of bills, invoices, checks, records statements, other documents and testimony to government agencies knowing full well that they were false. Consequently, Defendants are liable under the False Claims Act for payments they received.

3.      Plaintiff seeks $4,095,854.91 in treble damages, without interest, and a civil penalty of between $5,000 and $11,000 for each false claim.  Single damages would be $1,365,284.97, without interest.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C.

§§ 3730 and 3732, and 28 U.S.C. §§ 1331, 1345 and 3011.

5.      This Court has jurisdiction by virtue of 31 U.S.C. § 3732 because Defendants'

acts or omissions were directed at or affected the Export-Import Bank of the United States

("EXIM Bank") and because the alleged injuries to EXIM Bank arose out of and/or relate to

Defendants' acts or omissions.

6.      Venue is proper in this District by virtue of 31 U.S.C. § 3732, because

Defendants' acts or omissions were directed at or affected EXIM Bank, which is found in this

District, and because the alleged injuries to EXIM Bank occurred in this District and/or  arose

out of or relate to Defendants' acts or omissions.

## INTRODUCTION

7.      The Export-Import Bank of the United States ("EXIM Bank") is an independent agency

of the executive branch of the United States Government and is located at 811 Vermont Avenue N.W.,

Washington, DC, 20571. It is the official export credit agency of the United States for purposes of

international agreements. EXIM Bank's mission is to support U.S. jobs by supporting financing for the

export of United States goods and services to companies overseas.  One of the ways EXIM Bank fulfills

this mission is by issuing loan guarantees or loan insurance policies to financial institutions that are

making "short term" loans to foreign companies for the purpose of purchasing goods or services

exported from the United States. A "short term" loan is a loan, usually for the purchase of goods and/or

related services, and usually having a repayment term of no more than one year.

8.      Among the short-term financial programs run by the EXIM Bank is a Financial

Institution Buyer Credit Insurance Policy, which is informally known as a "reimbursement loan" or

"reach-back agreement."  A reimbursement loan is the funding of an insured transaction by the insured

(*i.e.*,, the financial institution) to the foreign buyer, in reimbursement of the foreign buyer's payments

to the US exporter. Such reimbursements would be made upon the presentation of an Exporter's

Certificate and trade documents consistent on their face with those certificates. The reimbursement

loan must be evidenced by a reimbursement loan agreement, which must be dated prior to the date of

the buyer's payment to the U.S. Exporter.

9.      EXIM Bank's loan guarantees and loan insurance policies both provide similar

coverage to the financial institution making the loan to the foreign-based buyer. If the foreign-based

buyer defaults on its loan obligations, the financial institution can file a claim with EXIM Bank.

Provided all the appropriate conditions have been met, EXIM Bank will pay the claim, take an

assignment of the foreign buyer's loan obligations, and pursue collection against the foreign-based

buyer. EXIM Bank relies upon a number of documents in evaluating whether to extend a guarantee or

insurance policy, or pay a claim filed against the guarantee or insurance policy, including the

application or certification prepared for EXIM Bank by or on behalf of the exporter and/or the foreign

borrower, and all relevant contractual agreements, such as those executed by the borrower and

exporter.

10.      In connection with both its guarantees and insurance policies, EXIM Bank requires that

a United States exporter – the person or entity selling the goods or services to the foreign buyer –

execute a prescribed form whereby the exporter certifies to the financial institution and EXIM Bank,

the type, amount, and value of the United States goods or services that it has shipped or will be shipped

(or, in the case of services, that it has delivered or will deliver) to its foreign buyer. In addition, the exporter must also certify either that the goods were 100% made in the United States, or the exporter must indicate by percentage the portion of the goods (on an aggregate value basis) that was or were made in the United States.

11.    If an insured loan defaults, as in this case, then the financial institution must file a claim with EXIM Bank in order to collect the promised coverage.  To file the claim, the insured financial institution must submit several documents to EXIM Bank. These documents are normally submitted by e-mail or other transmission utilizing the means of interstate wire communications, or by United States Postal Service or other interstate courier service. The required documents include an EXIM Claim Form, copies of the relevant invoices and bills of lading (or other shipping documents), the promissory note(s) signed by the foreign buyer, and the EXIM Bank form of Exporter's Certificate signed by the U.S. exporter.

12.    EXIM Bank pays most of its claims via wire transfers. All of the wire transfers are originated at EXIM Bank, 811 Vermont Ave, N.W., Washington, DC, by members of the Chief Financial Officer's staff by entering the payment into the Secure Payment System (SPS). An EXIM Bank certifying official reviews the wire transfer's validity and then approves the wire in the SPS. The request to send a wire transfer is then sent electronically from EXIM Bank to the Federal Reserve.

## THE PARTIES

### Plaintiff

13      Plaintiff is the United States of America.

### Defendants

14.     **JD EQUIPMENT de MEXICO, S de R.L. de CV** ("JD EQUIPMENT"), a retail
seller of used agricultural machinery with several locations in Mexico.  JD EQUIPMENT was
headquartered in Valle Hermoso, Mexico, during the relevant time of June 2011 through August
2013, as described in the Complaint.

15.     **SOUTH POINT EQUIPMENT, LLC** ("SOUTH POINT") - a U.S. exporter of
primarily used agricultural machinery was located in Brownsville, Texas, during the relevant time of
June 2011 through August 2013, as described in the Complaint

16.     **ALEXIS DUBOURDIEU URDANGARIN** ("DUBOURDIEU") - a naturalized U.S.
citizen residing in Texas, and owner and General Director of JD EQUIPMENT, as well as co-owner and
Director of SOUTH POINT.

## OTHER RELEVANT PARTIES

17.     **MARIA VALERIA MELAZZI-DUBOURDIEU** ("MELAZZI-DUBOURDIEU") – a
U.S. lawful permanent resident and Uruguayan national residing in Texas, and co-owner of SOUTH
POINT.  MELAZZI-DUBOURDIEU is also the wife of Alexis DUBOURDIEU.

18.      **BANCO MONEX, S.A., INSTITUCION de BANCA MULTIPLE,
MONEX GRUPO FINANCIERO** ("Banco Monex") – a Mexican financial institution and the
insured lender in the JD EQUIPMENT – SOUTH POINT transactions.

19.     **TRANSPORTES INTERAGROVIAL** ("TRANSPORTAS") – a Mexican shipping company owned by OMAR CISNEROS BENAVIDES and incorporated at the request of DUBOURDIEU.

20.     **OMAR CISNEROS BENAVIDES** ("CISNEROS") – a Mexican national residing in Texas, and minority owner of JD EQUIPMENT (.01%), and joint owner of TRANSPORTAS with his wife, Dora Morales.

21.     **HEDUMA L.L.C.** (HEDUMA) - a U.S. exporter of primarily used agricultural machinery located in San Benito, Texas, during the time period described in the Complaint.

## BACKGROUND

22.     In or about June 2011, Banco Monex applied to EXIM Bank to renew their Financial Institution Buyer Credit Insurance Policy which supported a revolving line of credit issued to JD EQUIPMENT to purchase US-made agricultural equipment.  The application was approved for $1,350,000 and assigned policy number FB-506267.  The application and policy named Alexis DUBOURDIEU as the guarantor on any potential debt.  The policy was active from August 1, 2011 to October 1, 2012.

23.     In or about August 2012, Banco Monex applied to EXIM Bank to renew policy FB-506267.  At that time, JD EQUIPMENT had an outstanding balance of approximately $1 million on the line of credit insured by the EXIM Bank policy, but was up-to-date on payments and no claims had been filed against the policy.  This application was approved for $1,260,000 and assigned a different policy number of FB-541199; however, the policy stipulated that any claim payments under this policy would be reduced by the amount of any claim payments made under policy FB-506267.  Again, the

application and policy named DUBOURDIEU as the guarantor, and the policy was in effect from October 1, 2012 to October 1, 2013.

24.     As explained above (¶ 8), the line of credit extended from Banco Monex to JD EQUIPMENT was a reimbursement loan, meaning JD EQUIPMENT would purchase U.S.-made equipment from a U.S. exporter, and pay for the equipment in-full.  JD EQUIPMENT would then submit records verifying the purchase, shipment, and payment for the equipment to Banco Monex. JD EQUIPMENT would also submit certain documents verifying the purchase and payment for the equipment, and certify the U.S. origin of the equipment through the Form of Exporter's Certificate. Once Banco Monex had these documents in place, DUBOURDIEU, on behalf of JD EQUIPMENT, would sign a promissory note for the amount of transaction.  Banco Monex would then disburse the loan amount to JD EQUIPMENT's Banco Monex account.  As more fully discussed below, during the relevant time period described in this Complaint, JD EQUIPMENT completed nine (9) such transactions with Banco Monex under EXIM Bank policies FB-506267 and FB-541199, totaling approximately $1,381,000.

## DEFENDANTS' FRAUDULENT TRANSACTIONS

### a.     Equipment With Serial Number H09660S706263 ("combine 6263") and Serial Number H00630R705988 ("platform 5988")

25.     On or about August 9, 2012, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of two pieces of equipment from SOUTH POINT, a John Deere combine with serial number H09660S706263 ("combine 6263"), and a John Deere platform with serial number H00630R705988 ("platform 5988").

26.     Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated June 18, 2012, for $162,000.00 ($145,000 for combine 6263 and $17,000 for platform 5988); (ii) a bill of lading from TRANSPORTES INTERAGROVIAL ("TRANSPORTAS") dated July 5, 2012, showing the equipment was shipped from SOUTH POINT in Brownsville, Texas, to JD EQUIPMENT in Valle Hermoso, Mexico; (iii) and a certification from JD Equipment dated August 2, 2012, signed by Alexis DUBOURDIEU, stating that JD EQUIPMENT had received the equipment from SOUTH POINT.

27.     In addition, Banco Monex received (i) a certification from SOUTH POINT dated July 30, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated July 31, 2012, signed by "Valeria Melazzi;" (iii) and an EXIM Bank Used Equipment Questionnaire dated July 31, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy 506267 dated August 9, 2012, and signed by DUBOURDIEU, was submitted to Banco Monex for $162,000.  On that date, Banco Monex disbursed $162,000 to a JD Equipment account.

**b.     Equipment With Serial Number H09770S728013 ("combine 8013")**

28.     On or about September 24, 2012, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial number H09770S728013 ("combine 8013").  Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated July 18, 2012, for $197,000.00; (ii) a bill of lading from TRANSPORTAS dated August 30, 2012, showing the equipment was shipped from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; (iii) and a

certification from JD Equipment dated September 18, 2012, signed by Alexis DUBOURDIEU, stating that JD EQUIPMENT had received the equipment from SOUTH POINT.

29.     In addition, Banco Monex received a certification from SOUTH POINT dated September 13, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in full from JD EQUIPMENT; an EXIM Bank Form of Exporter's Certificate dated August 30, 2012, signed by "Valeria Melazzi;" and an EXIM Bank Used Equipment Questionnaire dated August 30, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy 506267 dated September 24, 2012, and signed by DUBOURDIEU, was submitted to Banco Monex for $197,000. On that date, Banco Monex disbursed $197,000 to a JD Equipment account.

### c.     Equipment with Serial Number H09760S717114 ("combine 7114")

30.     On or about September 26, 2012, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial number H09760S717114 ("combine 7114").  Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated July 27, 2012, for $160,000.00; (ii) a bill of lading from TRANSPORTAS dated September 6, 2012 showing the equipment was shipped from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico;  and (iii) a certification from JD Equipment dated September 18, 2012, signed by Alexis DUBOURDIEU, stating that JD EQUIPMENT had received the equipment from SOUTH POINT.

31.     In addition, Banco Monex received (i) a certification from SOUTH POINT dated September 13, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated September 6, 2012, signed by "Valeria Melazzi;" and (iii) an EXIM Bank Used Equipment Questionnaire dated

September 6, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy 506267 dated September 26, 2012, and signed by DUBOURDIEU, was submitted to Banco Monex for $160,000.  On that date, Banco Monex disbursed $160,000 to a JD Equipment account.

### d.  Equipment With Serial Number H09660S721565 ("combine 1565")

32.     On or about September 28, 2012, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial number H09660S721565 ("combine 1565").  Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated July 23, 2012, for $147,000.00; (ii) a bill of lading from TRANSPORTAS dated September 10, 2012, showing the equipment was shipped from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; and (iii) a certification from JD Equipment dated September 19, 2012, signed by Alexis DUBOURDIEU, stating that JD EQUIPMENT had received the equipment from SOUTH POINT.

33.     In addition, Banco Monex received (i) a certification from SOUTH POINT dated September 13, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated September 13, 2012, signed by "Valeria Melazzi;" and  (iii) an EXIM Bank Used Equipment Questionnaire dated September 10, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy 506267 dated September 28, 2012, and signed by DUBOURDIEU, was submitted to Banco Monex for $147,000.  On that date, Banco Monex disbursed $147,000 to a JD Equipment account.

### e.  Equipment With Serial Number H09760S717100 ("combine 7100")

34.     On or about November 13, 2012, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial

number H09760S717100 ("combine 7100").  Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated August 6, 2012 for $165,000.00;  (ii) a bill of lading from TRANSPORTAS dated September 13, 2012, showing the equipment was shipped from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; and (iii) a certification from JD Equipment dated November 6, 2012, signed by Alexis DUBOURDIEU, stating that JD EQUIPMENT had received the equipment from SOUTH POINT.

35.     In addition, Banco Monex received (i) a certification from SOUTH POINT dated September 13, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated September 13, 2012, signed by "Valeria Melazzi;" and (iii) an EXIM Bank Used Equipment Questionnaire dated September 13, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy 541199 dated November 13, 2012, and signed by DUBOURDIEU, was submitted to Banco Monex for $165,000.  On that date, Banco Monex disbursed $165,000 to a JD Equipment account.

### f. Equipment With Serial Number H09760S706175 ("combine 6175")

36.    On or about November 26, 2012, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial number H09760S706175 ("combine 6175").  Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated August 16, 2012, for $155,000.00; (ii) a bill of lading from TRANSPORTAS dated September 18, 2012, showing the equipment was shipped from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; and (iii) a certification from JD Equipment dated November 15, 2012, signed by Alexis DUBOURDIEU, stating that JD EQUIPMENT had received the equipment from SOUTH POINT.

37.    In addition, Banco Monex received (i) a certification from SOUTH POINT dated September 18, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated September 18, 2012 signed by "Valeria Melazzi;" and (iii) an EXIM Bank Used Equipment Questionnaire dated September 18, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy 541199 dated November 26, 2012, and signed by DUBOURDIEU, was submitted to Banco Monex for $155,000.  On that date, Banco Monex disbursed $155,000 to a JD Equipment account.

### g. Equipment With Serial Number H09750S700935 ("combine 0935")

38.    On or about January 11, 2013, JD EQUIPMENT submitted to Banco Monex documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial number H09750S700935 ("combine 0935").  Among the documents submitted to Banco Monex were: (i) a SOUTH POINT invoice to JD EQUIPMENT dated August 24, 2012, for $125,000.00; (ii) a bill of lading from TRANSPORTAS dated September 18, 2012, showing the equipment was shipped

from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; and (iii)

a certification from JD Equipment dated January 4, 2013, signed by Alexis DUBOURDIEU, stating

that JD EQUIPMENT had received the equipment from SOUTH POINT.

39.     In addition, Banco Monex received (i) a certification from SOUTH POINT dated

September 18, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment

in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated September 20,

2012 signed by "Valeria Melazzi;" and (iii) an EXIM Bank Used Equipment Questionnaire dated

September 20, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy

541199 dated January 11, 2013, and signed by DUBOURDIEU, was submitted to Banco Monex for

$125,000.  On that date, Banco Monex disbursed $125,000 to a JD Equipment account.

### h.     Equipment With Serial Number H09760S717285 ("combine 7285")

40.     On or about January 15, 2013, JD EQUIPMENT submitted to Banco Monex

documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial

number H09760S717285 ("combine 7285").  Among the documents submitted to Banco Monex were:

(i) a SOUTH POINT invoice to JD EQUIPMENT dated August 14, 2012 for $160,000.00; (ii) a bill

of lading from TRANSPORTAS dated September 17, 2012, showing the equipment was shipped from

SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; and (iii) a

certification from JD Equipment dated January 4, 2013, signed by Alexis DUBOURDIEU, stating

that JD EQUIPMENT had received the equipment from SOUTH POINT.

41.     In addition, Banco Monex received (i) a certification from SOUTH POINT dated

September 13, 2012, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment

in full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated September 17,

2012 signed by "Valeria Melazzi;" and (iii) an EXIM Bank Used Equipment Questionnaire dated

September 17, 2012, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy

541199 dated January 15, 2013, and signed by DUBOURDIEU, was submitted to Banco Monex for

$160,000.  On that date, Banco Monex disbursed $160,000 to a JD Equipment account.

### i.      Equipment With Serial Number H097650S701170 ("combine 1170")

42.      On or about February 8, 2013, JD EQUIPMENT submitted to Banco Monex

documents purporting to show the purchase of one John Deere combine from SOUTH POINT, serial

number H097650S701170 ("combine 1170").  Among the documents submitted to Banco Monex

were:  a SOUTH POINT invoice to JD EQUIPMENT dated December 17, 2012, for $110,000.00; a

bill of lading from TRANSPORTAS dated December 20, 2012 showing the equipment was shipped

from SOUTH POINT in Brownsville, Texas to JD EQUIPMENT in Valle Hermoso, Mexico; and a

certification from JD Equipment dated January 23, 2013, signed by Alexis DUBOURDIEU, stating

that JD EQUIPMENT had received the equipment from SOUTH POINT.

43.      In addition, Banco Monex received (i) a certification from SOUTH POINT dated

January 21, 2013, signed by "Valeria Melazzi," stating that SOUTH POINT had received payment in

full from JD EQUIPMENT; (ii) an EXIM Bank Form of Exporter's Certificate dated January 21,

2013, signed by "Valeria Melazzi;" and (iii) an EXIM Bank Used Equipment Questionnaire dated

January 21, 2013, signed by "Valeria Melazzi."  A promissory note referencing EXIM Bank policy

541199 dated February 8, 2013, and signed by DUBOURDIEU, was submitted to Banco Monex for

$110,000.  On that date, Banco Monex disbursed $110,000 to a JD Equipment account.

**DEFAULT AND CLAIM**

44.     The combined amount of all nine disbursements from Banco Monex to the JD

EQUIPMENT account was $1,381,000.   JD EQUIPMENT, as the debtor, and DUBOURDIEU, as

the guarantor, failed to pay back that amount.

45.     Banco Monex attempted to negotiate a settlement with DUBOURDIEU and JD

EQUIPMENT, without success.

46.     Consequently, Banco Monex filed claims with EXIM Bank under policies FB-506267

and FB-541199.  Banco Monex sent the claims via FedEx (under tracking number 799681400852) on

May 3, 2013, which were received by EXIM Bank in Washington, DC, on May 6, 2013.  Included in

the claims packages were the above referenced transaction documents (¶¶ 25-43) showing the nine

alleged sales and exports of equipment from SOUTH POINT to JD EQUIPMENT.  Claim I200232

(corresponding with policy 506267) was paid by EXIM Bank on July 22, 2013, in the amount of

$710,214.34.  Claim I200231 (corresponding with policy 541199) was paid on August 26, 2013, in

the amount of $655,070.63.  The combined amount of the claims payments was $1,365,284.97.

47.     Following payment of the respective claims, EXIM Bank assumed the debt amounts

from Banco Monex and pursued collection.  On July 30, 2013, and September 18, 2013, respectively,

EXIM Bank sent Demand Letters to JD EQUIPMENT and DUBOURDIEU making demands on the

company and DUBOURDIEU, as the guarantor, for immediate payment of the claim amounts.

48.     As of the date of this Complaint, neither JD EQUIPMENT nor DUBOURDIEU

personally has made any payments to EXIM Bank.  Since the date of the claims, interest on the debt

has accumulated as agreed to under the policies and Banco Monex's credit agreement.  As of March

7,  2019, the total debt amount owed by JD EQUIPMENT and DUBOURDIEU was $ 2,955,765.07,

with interest.

## DEFENDANTS' FRAUDULENT CONDUCT

49.     In Banco Monex' effort to collect the defaulted loan amount prior to submitting the

claim to EXIM Bank, Banco Monex discovered ownership ties between JD EQUIPMENT and

SOUTH POINT that had not previously been disclosed in the application process or in the course of

the transactions.  Specifically, DUBOURDIEU, the owner of 99.9% of JD EQUIPMENT, was the

joint owner of SOUTH POINT, along with his wife, MARIA MELAZZI-DUBOURDIEU.

50.     Banco Monex was not aware of the common ownership between the two companies,

JD EQUIPMENT and SOUTH POINT.  Although it was not prohibited for an individual to have a

stake in both the U.S. exporter and the foreign buyer in an EXIM Bank-backed transaction,

DUBOURDIEU failed to disclose his common ownership of both companies to Banco Monex and

EXIM Bank during the application process.  Additionally, had Banco Monex been aware that

DUBOURDIEU was, for all intents and purposes, the sole owner of both companies (JD

EQUIPMENT and SOUTH POINT), Banco Monex would not have approved the transaction.

51.     DUBOURDIEU's failure to disclose the common ownership of JD EQUIPMENT and

SOUTH POINT led to requests for Mexican "Pedimentos" or customs documents from the Mexican

government, which revealed no records of the nine pieces of equipment, discussed in ¶¶ 25-43 above,

having been exported from SOUTH POINT to JD EQUIPMENT.

52.     OMAR CISNEROS BENAVIDES ("CISNEROS") performed accounting work for

DUBOURDIEU in Mexico. Under Mexican law, when DUBOURDIEU took ownership of JD

EQUIPMENT, he needed a Mexican citizen to be a part owner.  CISNEROS purchased a one-tenth of

one percent (.1%) share of JD EQUIPMENT so that it could  be incorporated in Mexico.  CISNEROS had no knowledge of SOUTH POINT and had not conducted any business with or on behalf of SOUTHPOINT.

53.     CISNEROS and his wife incorporated TRANSPORTAS at the request of DUBOURDIEU.  DUBOURDIEU planned to use TRANSPORTAS to ship equipment on behalf of JD EQUIPMENT, but TRANSPORTAS was never operational.  TRANSPORTAS never conducted any business, never shipped a single piece of equipment, never opened a bank account, and never earned any income.

54.     CISNEROS reviewed the bills of lading submitted to Banco Monex as evidence of the export of equipment from SOUTH POINT to JD EQUIPMENT and later transmitted to EXIM Bank with Banco Monex' insurance claim.  CISNEROS had never seen the bills of lading previously and was not familiar with the alleged TRANSPORTAS employee, Raul Medina, named on the bills of lading.

55.     MELAZZI-DUBOURDIEU owned SOUTH POINT with her husband, DUBOURDIEU.  MELAZZI-DUBOURDIEU assisted with clerical tasks, but DUBOURDIEU ran the day-to-day operations of the company.

56.     Documents bearing the signature of "Valeria Melazzi" listed in ¶¶ 27, 29, 31, 33, 35, 37, 39, 41, and 43 above were forged.  The documents with the forged signatures were submitted to Banco Monex as evidence of the JD EQUIPMENT – SOUTH POINT transactions, and later transmitted to EXIM Bank as part of Banco Monex' claims under its insurance policies with EXIM Bank.

57.     Records show the nine pieces of equipment mentioned in ¶¶ 25-43 were otherwise exported from the United States to Mexico; however, those exports were not related to the JD EQUIPMENT – SOUTH POINT transactions involving Banco Monex:

a)     Combine 6263, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $145,000 and shipped via TRANSPORTAS on July 5, 2012, was previously sold to JD EQUIPMENT by JD Export Co. of London, in Ohio, on March 18, 2005, for $141,000.

b)     Combine 8013, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $197,000 and shipped via TRANSPORTAS on August 30, 2012, was previously exported to Mexico on June 4, 2012, and sold again to JD EQUIPMENT by a Mexican subsidiary of HEDUMA L.L.C ("HEDUMA") on or about September 28, 2012, for $160,000.

c)     Combine 7114, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $160,000 and shipped via TRANSPORTAS on September 6, 2012, was previously exported to Mexico on May 22, 2012, after being sold by a U.S. retail company to a Mexican buyer, both unrelated to the JD EQUIPMENT – SOUTH POINT transaction, for $102,000.

d)     Combine 1565, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $147,000 and shipped via TRANSPORTAS on September 10, 2012, was actually sold on or about September 10, 2012, for $129,000, by HEDUMA to JD EQUIPMENT

e)   Combine 7100, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $165,000 and shipped via TRANSPORTAS on September 13, 2012, was previously sold by HEDUMA to JD EQUIPMENT on or about September 10, 2012, for $133,000.

f)   Combine 6175, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $155,000 and shipped via TRANSPORTAS on September 18, 2012, was actually exported to Mexico on September 19, 2012, after being sold by a U.S. retail company to a Mexican buyer, both unrelated to the JD EQUIPMENT – SOUTH POINT transaction, for $88,000.

g)   Combine 0935, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $125,000 and shipped via TRANSPORTAS on September 18, 2012, was actually exported to Mexico on October 2, 2012, after being sold by a U.S. retail company to a Mexican buyer, both unrelated to the JD EQUIPMENT – SOUTH POINT transaction, for $66,000.

h)   Combine 7285, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $160,000 and shipped via TRANSPORTAS on September 17, 2012, was previously sold to JD EQUIPMENT by HEDUMA on or about September 10, 2012, for $134,000.

i)   Combine 1170, alleged to have been sold by SOUTH POINT to JD EQUIPMENT for $110,000 and shipped via TRANSPORTAS on December 20, 2012, was known to have been previously sold to a Mexican buyer unrelated to the JD EQUIPMENT

– SOUTH POINT transaction, on or about May 22, 2003, for an unknown amount, and exported to Mexico.

## COUNT I
### (False Claims
### 31 U.S.C. § 3729(a)(1)(A)

58.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 57 as if fully set forth herein.

59.     Among the manner and means by which Defendants carried out the scheme were the following:

a)           JD EQUIPMENT, through DUBOURDIEU, submitted fraudulent documents, including false or fraudulent invoices, false or fraudulent bills of lading, and false or fraudulent certifications of receipts of shipment to Banco Monex in order to draw down on the insured line of credit;

b)           SOUTH POINT, through DUBOURDIEU, submitted fraudulent documents, including false or forged certifications of payment to JD EQUIPMENT; false or forged EXIM Bank Form of Exporter's Certificates; and false or forged EXIM Bank Used Equipment Questionnaire; and false or forged promissory notes to Banco Monex

c)           DUBOURDIEU, as the owner of both JD EQUIPMENT and SOUTH POINT, caused those false and fraudulent documents to be transmitted to EXIM Bank, through Banco Monex;

d)           Defendants' false and fraudulent documents were relied upon by Banco Monex in order to disburse funds to JD EQUIPMENT, as well as by EXIM Bank in deciding to authorize claim payments to Banco Monex.

21

e)        DUBOURDIEU attempted to conceal his common ownership of JD EQUIPMENT and SOUTH POINT by causing certifications bearing the forged signatures of his wife's pseudonym, "Valeria Melazzi," to be submitted to Banco Monex and EXIM Bank.

f)        DUBOURDIEU, as the owner of JD EQUIPMENT and SOUTH POINT did engage in these acts knowingly and willfully in order to receive disbursements totaling approximately $1,381,000 from Banco Monex.

g)        DUBOURDIEU's fraudulent and deceptive actions led directly to Banco Monex's eventual claim under the insurance policies with EXIM Bank and a loss to the U.S. Government of $1,365,284.97.

60.    By virtue of the acts set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims, to the United States for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); the purpose and objective of the scheme was for Defendants to unlawfully enrich themselves by submitting false or fraudulent claims, certifications or information to EXIM Bank, through BANCO MONEX, in order to obtain a disbursal of loan funds insured by EXIM Bank, in association with transactions in which the equipment were not exported as certified by Defendants; that Defendants caused the false or fraudulent claims to be approved and paid by the United States, in violation of 31 U.S.C. § 3729(a)(1); that the United States has currently incurred damages of at least $1,365,284.97 plus interest; and that the United States is entitled to three times the amount by which it is damaged, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented.

## COUNT II
### (False Record, Statement Material to a False or
### Fraudulent Claim, Certification)
### 31 U.S.C. § 3729(a)(1)(B)

61.     Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 60 as if fully set forth herein.

62.     Among the manner and means by which Defendants carried out the scheme were the following:

      a.     JD EQUIPMENT, through DUBOURDIEU, submitted fraudulent documents, including false or fraudulent invoices, false or fraudulent bills of lading, and false or fraudulent certifications of receipts of shipment to Banco Monex in order to draw down on the insured line of credit;

      b.     SOUTH POINT, through DUBOURDIEU, submitted fraudulent documents, including false or forged certifications of payment to JD EQUIPMENT; false or forged EXIM Bank Form of Exporter's Certificates; and false or forged EXIM Bank Used Equipment Questionnaire; and false or forged promissory notes to Banco Monex

      c.     DUBOURDIEU, as the owner of both JD EQUIPMENT and SOUTH POINT, caused those false and fraudulent documents to be transmitted to EXIM Bank, through Banco Monex;

      d.     Defendants' false and fraudulent documents were relied upon by Banco Monex in order to disburse funds to JD EQUIPMENT, as well as by EXIM Bank in deciding to authorize claim payments to Banco Monex.

e.          DUBOURDIEU attempted to conceal his common ownership of JD

EQUIPMENT and SOUTH POINT by causing certifications bearing the forged signatures

of his wife's pseudonym, "Valeria Melazzi," to be submitted to Banco Monex and EXIM

Bank.

f.          DUBOURDIEU, as the owner of JD EQUIPMENT and SOUTH

POINT did engage in these acts knowingly and willfully in order to receive disbursements

totaling approximately $1,381,000 from Banco Monex.

g.          DUBOURDIEU's fraudulent and deceptive actions led directly to

Banco Monex's eventual claim under the insurance policies with EXIM Bank and a loss to

the U.S. Government of $1,365,284.97.

63.     By virtue of the acts set forth above, Defendants knowingly presented, or caused to be

presented, false or fraudulent certifications to the United States, in violation of 31 U.S.C.

§3729(a)(1); the purpose and objective of the scheme was for Defendants to unlawfully enrich

themselves by submitting false claims and/or fraudulent certification or information to EXIM

Bank through Banco Monex, in order to obtain a disbursal of loan funds insured by EXIM

Bank, in association with transactions in which Defendants did not fully deliver the products

which Defendants were contracted to export, and which Defendants certified had been

exported; that Defendants caused the false or fraudulent claims to be approved and paid by the

United States; that the United States has currently incurred damages of at least $1,365,284.97

plus interest; and that the United States is entitled to three times the amount by which it is

damaged, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to

be presented.

## COUNT III
### (Common Law Fraud)

64      Plaintiff incorporates by reference the allegations set forth in Paragraphs

1 through 63 as if fully set forth herein.

65.     Among the manner and means by which Defendants carried out the scheme

were the following:

a.      JD EQUIPMENT, through DUBOURDIEU, submitted

fraudulent documents, including false or fraudulent invoices, false or fraudulent bills of

lading, and false or fraudulent certifications of receipts of shipment to Banco Monex in order

to draw down on the insured line of credit;

b.      SOUTH POINT, through DUBOUDRIEU, submitted fraudulent

documents, including false or forged certifications of payment to JD EQUIPMENT; false or

forged EXIM Bank Form of Exporter's Certificates; and false or forged EXIM Bank Used

Equipment Questionnaire; and false or forged promissory notes to Banco Monex

c.      DUBOURDIEU, as the owner of both JD EQUIPMENT and

SOUTH POINT, caused those false and fraudulent documents to be transmitted to EXIM

Bank, throught Banco Monex;

d.      Defendants' false and fraudulent documents were relied upon by

Banco Monex in order to disburse funds to JD EQUIPMENT, as well as by EXIM Bank in

deciding to authorize claim payments to Banco Monex.

e.      DUBOURDIEU attempted to conceal his common ownership of JD EQUIPMENT and SOUTH POINT by causing certifications bearing the forged signatures of his wife's pseudonym, "Valeria Melazzi," to be submitted to Banco Monex and EXIM Bank.

f.      DUBOURDIEU, as the owner of JD EQUIPMENT and SOUTH POINT did engage in these acts knowingly and willfully in order to receive disbursements totaling approximately $1,381,000 from Banco Monex.

g.      DUBOURDIEU's fraudulent and deceptive actions led directly to Banco Monex's eventual claim under the insurance policies with EXIM Bank and a loss to the U.S. Government of $1,365,284.97.

66.      By virtue of the acts set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent certifications to the United States; the purpose and objective of the scheme was for Defendants to unlawfully enrich themselves by submitting false claims and/or fraudulent certification or information to EXIM Bank through Banco Monex, in order to obtain a disbursal of loan funds insured by EXIM Bank, in association with transactions in which Defendants did not fully deliver the products which Defendants were contracted to export, and which Defendants certified had been exported; that Defendants caused the false or fraudulent claims to be approved and paid by the United States; that the United States has currently incurred damages of at least $1,365,284.97 plus interest.

67.      Defendants' misrepresentations were material.

68.      Defendants knew that Banco Monex and EXIM Bank would rely, and intended Banco Monex and EXIM Bank to rely, on these false representations.

69.      EXIM Bank justifiably relied upon these false representations and material omissions.

26

70.    By virtue of Defendants' fraud, the United States suffered damages in the amount of at least $1,365,284.97 plus interest.

## COUNT IV
## (Breach of Contract)

71.    The United States incorporates by reference the allegations set forth in Paragraphs 1 through 76 as if fully set forth herein.

72.    DUBOURDIEU and JD EQUIPMENT entered into contracts with Banco Monex, under a loan insured by EXIM Bank. The loan agreement and the Promissory Note imposed obligations on DUBOURDIEU and JD EQUIPMENT to repay the loans disbursed by Banco Monex.

73.    DUBOURDIEU and JD EQUIPMENT breached their contractual obligations by failing or ceasing to make any payments under the terms of the loan agreement, which caused the loan to go into default.

74.    As a result of breach of contracts by DUBOURDIEU and JD EQUIPMENT, Banco Monex submitted a claim under EXIM Bank Insurance Policy Numbers 506267 and 541199 for a total of $1,365,284.97.

75.    In July and September 2013, EXIM Bank, as the owner of the indebtedness, made demand on DUBOURDIEU and JD EQUIPMENT, without any success.

76.    By virtue of breach of contract by DUBOURDIEU and JD EQUIPMENT, the United States has been damaged. The failure to make loan payments by DUBOURDIEU and JD EQUIPMENT caused the loan to go into default, causing damages in an amount to be determined at trial.

27

## COUNT V
## (Unjust Enrichment Claim)

77.      Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 64 as if fully set forth herein.

78.      The United States paid to DEFENDANTS, through Banco Monex, monies and costs, by which these DEFENDANTS were unjustly enriched.

79.      The United States is entitled to the return of all payments paid to DEFENDANTS and other damages in an amount to be established at trial.

## DAMAGES

80.      As a result of the above false or fraudulent claims for payment; false records, statements or certifications; conspiracy to obtain payment for a false claim; breach of contract, fraud, and unjust enrichment, the United States suffered single damages totaling $1,365,284.97, plus interest.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that the Court enter judgment under

Counts I through V and award to the United States of America the following:

a. All amounts paid to Defendants, plus interest;

b. Damages in the amount of three times the amounts paid to Defendants, plus

interest

c. Statutory penalties;

d. All attorneys' fees and costs incurred by the United States of America as a result

of this action;

e. Any such other relief as this Court may deem just and proper.


*[Signature block on the next page]*

29

Dated: April 22, 2019　　　　　　　　Respectfully submitted,

JESSIE K. LIU
D.C. BAR # 472845
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Chief, Civil Division

By:　　　//s// John C. Truong
　　　　John C. Truong, D.C. BAR # 465901
　　　　Assistant United States Attorney
　　　　United States Attorney's Office
　　　　for the District of Columbia
　　　　555 Fourth Street, NW
　　　　Washington, D.C.  20530
　　　　Tel: (202) 252-2524
　　　　Fax: (202) 252-2599
　　　　E-mail: John.Truong@usdoj.gov
　　　　Counsel for Plaintiff United States of America